IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

LAVOTHA RABY, TERRY WILSON,    )
VERA CARR, TAMMY CLARK,         )
BRENDA HARRIS, JESSIE JONES,    )
MITCHELL LILLY, SARAH ANN       )
SALTERS, and JAMES YOUNG,       )
                                )
　　　　Plaintiffs,              )          CV-07-RRA-516-W
                                )
v.                              )
                                )
ALABAMA DEPARTMENT OF           )
MENTAL HEALTH and MENTAL        )
RETARDATION and                 )
COMMISSIONER JOHN M.            )
HOUSTON,                        )
                                )
　　　　Defendants.             )

## REPORT AND RECOMMENDATION

This is a civil matter filed by Lavotha Raby, Terry Wilson, Vera Carr, Tammy Clark,

Brenda Harris, Jessie Jones, Mitchell Lilly, Sarah Ann Salters, James Young, Janice Boyd, and

Parthenia Woods. The defendant is the State of Alabama Department of Mental Health and

Mental Retardation.[1] The complaint alleges race discrimination, in violation of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e and 42 U.S.C. § 1981.[2] The case is now

---

[1] The plaintiffs' complaint names both the Alabama Department of Mental Health and Mental Retardation **and** the Commissioner of the Alabama Department of Mental Health and Mental Retardation, John M. Houston. However, there is not a single allegation against Houston in his individual capacity in the first amended complaint. In his official capacity, Houston is essentially the same entity as the department. Therefore, Houston is due to be dismissed.

[2] Count four of the first amended complaint also alleges state law claims of negligent and wanton hiring and supervision against the defendant. Those claims were dismissed on April 29, 2009. (Doc. 43.)

before the court on the defendant's motion for summary judgment.  (Doc. 28.)

## STANDARD OF REVIEW

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P.56.  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).  Once that initial burden has been carried, the non-moving party may not merely rest upon his pleadings, but must come forward with evidence supporting each essential element of his claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989).  Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).

## FACTS

### The Defendant

The defendant is a statutory agency of the state of Alabama, created for the care,

treatment, and training of the state's citizens who suffer from serious mental illness or retardation. The Department's chief executive officer is its Commissioner, who is appointed by the governor. The Commissioner is also a member of the governor's cabinet.

Organization of Partlow

For many years, Partlow Developmental Center [hereinafter Partlow], located in Tuscaloosa, Alabama, has been a facility operated for the treatment and training of individuals with mental retardation. (Liles Affid. 2.)[3]  During the time period pertinent to this litigation, there have been two permanent directors of Partlow and two acting directors. Steve Spier, a white male, was Partlow Director from January 1, 2005, to January 31, 2006, when he retired. From February 1, 2006, to August 16, 2006, Eranell McIntosh-Wilson, a black female, and Judith Johnston, a white female, jointly served (in an acting capacity) as Partlow Directors.[4]  Beginning August 17, 2006, Vance Liles, a white male, became the Partlow Director. At the time of the filing of the instant motion, he continued to serve in that capacity. Michael Mathis, a white male, has been the Personnel Director at Partlow since

---

[3]The plaintiffs dispute this fact and state that "Plaintiffs testified that Partlow's clients are both mentally ill and mentally retarded." (Doc. 35, pp. 2-3.)  The plaintiffs provides no citation to the record in support of this statement.  The court's summary judgment guidelines specifically state that "[a]ny statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based.  All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment." (Doc. 20, p. A-6.)  The order also states that "[t]he court reserves the right sua sponte to STRIKE any statements of fact or responsive statements that fail to comply with these requirements." (Doc. 20, p. A-7.)  Since no citation appears, the court deems the statement to be admitted.

[4]At the time, Ms. McIntosh-Wilson was the Department's Associate Commissioner for Mental Retardation Services and Ms. Johnston was the Department's Director of Mental Retardation Facilities. Both individuals were based in the Department's central office in Montgomery.

May, 2004. (Mathis Depo. 13.) Mathis' duties consists of overseeing the personnel department, referred to by the parties as "call line level duties". Mathis' supervisor is Vance Liles, a white male. Liles is the Facility Director. Mathis testified that Partlow currently has approximately 332 Mental Health Worker Is [hereinafter MHW I], twenty-five to thirty MHW IIs, approximately twenty MHW IIIs, and four Unit Directors. (Mathis Depo. 35-36.)[5] Mathis testified that he was not sure, but that he estimated that Partlow has "a little over 200" clients, "210 to 220. It may vary."[6] (Mathis Depo. 38.)

Partlow has no psychiatrists on staff, and only one psychologist, Tammy Carroll. Carroll reports to Becky Belluah, a white female and the Assistant Facility Director. There is only one physician, Mark Woods. He reports directly to Liles.

Mathis testified that he does not have any input into the number of budgeted positions at Partlow, but that he could be consulted as to the need for additional MHWs. (Mathis Depo. 40.) Mathis does not have any input into the matter of the staff-to-client ratio. The team determines this ratio. (Boyd Depo. 127.)[7]

---

[5]MHW Is, IIs, and IIIs are also referred to (at Partlow) as Client Training Specialists Is, IIs, and IIIs or CTSs.

[6]The term "client" is sometimes used by the parties to describe residents or patients at Partlow. The court has adopted that term.

[7]The plaintiffs state:

> 49.     None of the Plaintiffs in the lawsuit is on a 1 to 1 ratio with clients. (Boyd Depo. P. 128)

(Plaintiff's Brief in Opposition to the Motion for Summary Judgment (hereinafter doc. 35), at p. 20.) The court does not know what this statement means. Plaintiff Boyd was asked by her attorney, "Are any of the plaintiffs in this lawsuit on a one-to-one ratio?" and she answered "Not that I can recall. I don't think so." (Boyd Depo. 127-128.) Defense counsel objected to the question. Defendant

The Director of Residential Services reports directly to Liles. Mathis does not have authority to hire additional staff that is not accounted for in his budget. Liles has ultimate authority for the hiring process and has complete firing authority over CTSs. He reviews the registry..

In early 2004, with the final closure of the defendant's other facilities for the care of individuals with mental retardation, Partlow became the defendant's only facility to serve these clients. Up to this point, individuals at other mental retardation facilities who could not be moved to community facilities, either because of their particular needs or because of family preference, were transferred to Partlow.

## Employee Injury Procedure

The State Employee Injury Compensation Trust Fund [hereinafter SEICTF] was created by the Alabama legislature in October, 1994. Its purpose is to provide indemnity and medical benefits for on-the-job injuries to state employees. Indemnity benefits consist of lost wages caused by an employment injury, payment for permanent partial and permanent total disability, as well as payments to dependents and burial expenses in the event of a fatal injury. SEICTF is similar to Worker's Compensation and is administered by the Division of Risk Management of the Alabama Department of Finance. See Ala. Code, §36-29A-1, et seq.

If an employee is injured, he or she fills out a State Employee Injury Compensation

---

states that it can neither admit nor deny this statement because it is unclear. The court cannot determine the period of time to which the plaintiffs refer: does the question refer to the period of the lawsuit, the period of time during which the question was asked, or at all times? Further, is the question asking whether the plaintiffs are, or were ever, assigned to a 1 to 1 ratio? Because of its vagueness, the statement is not probative and is STRICKEN.

Trust Fund Form, Employee First Report of Accident, as well as another form if medical assistance is required. These documents are to be maintained in a personnel injury file kept by Linda Jones, Personnel Specialist II in the Personnel Department.

Client Residences at Partlow

Some of the clients at Partlow who have been transferred from Taylor Hardin have been charged with sex offenses and/or murder and have dual diagnoses of mental illness and mental retardation. (Boyd Depo. 119.)

During the time pertinent to this lawsuit and including the present, Partlow clients reside in nine "Homes." The Homes are given numerical designations of 1, 2, 3, 4, 6, 7, 8, and 9 and 10.[8] Each Home has its own living and dining area, in addition to client bedrooms. The Homes are grouped into four units, which also are given Roman numeral designations of Unit I (Homes 1 and 2), Unit II (Homes 8 and 9), Unit III (Homes 6, 7, and 10), and Unit IV (Homes 3 and 4). Individuals designated as "Home Managers" are responsible for the operation of each of the four Units. (Liles Affid. 2.)[9] Mathis' office is approximately 150 yards from the nearest client home. Once every two or three months

---

[8]There is no home numbered 5.

[9]The plaintiffs dispute this statement saying:

Denied. Mr. Liles, Facility Director, has supervisory and control over the Residential Managers. The Director of Residential Services reports directly to Mr. Liles. (Mathis Depo. P.47) Mr. Liles has sole authority for the hiring process, i.e., he reviews all applications and the registry. (Mathis Depo. P.52, 130) Mr. Liles has complete firing and disciplinary authority over CTS'. (Mathis Depo. P. 66)

However, these statements do not dispute who was <u>directly</u> responsible for the operation of the units.

Mathis walks through two or three homes to ensure cleanliness and staff performance.

Patricia Sykes, a black female, was the Home Manager for Unit I from July 20, 1985 to November 26, 2004. Diane Salley, a white female, became the Home Manager for Unit I on November 27, 2004.

Arthurine Merritt, a black female, was the Home Manager for Unit II from July 12, 2004 to May 31, 2007. Sykes served as acting Home Manager for Unit II from June 1, 2007 to July 31, 2007. Charlotte Smith, a black female, became the Home Manager for Unit II on August 1, 2007.

Wesley Scarritt, a white male, was the Home Manager for Unit III from September, 1994 to July 29, 2005. Earnest Washington, a black male, became Home Manager for Unit III on August 1, 2005.

Ophelia Riley, a black female, was the Home Manager for Unit IV from December 27, 2003 to July 29, 2005. Sykes, was the acting Home Manager of that Unit from August 1, 2005 to September 30, 2005. Troy Lewis, a black male , became Home Manager of Unit IV on October 1, 2005.

At the time of the filing of the instant motion, the four Units were supervised by Partlow's Director of Residential Services. From October 16, 2004 to the time of the filing of this motion, Patricia Sykes has served as the Director of Residential Services.

<u>Care at Partlow</u>

Direct care and supervision of Partlow clients is provided by MHW I's.  The duties of an MHW I are to assist the clients with daily living skills, based on their needs, including transport, escort, assistance in hygiene and dressing, and assistance in training and activities.

7

MHW Is are not required to have a high school diploma or GED. Mathis remembered only one white MHW who had been terminated in the last four years. (Mathis Depo. 79.)[10]

In the last year, Mathis has processed over 100 disciplinary actions, but cannot state the number of employees who were white. Ten of the eleven plaintiffs in this lawsuit are Mental Health Worker Is. The other, Sarah Ann Salters, is a Registered Nurse II. MHW IIs and MHW IIIs supervise MHW Is and provide some direct client care and supervision. (Sykes Affid. 2.)[11] Partlow clients require different levels of supervision. Some Mental Health Worker Is are assigned to work with just one client, and some are assigned responsibility for multiple clients. The decision of how closely to supervise is based on the needs of that particular client, which can periodically change.

Reassignment of Employees and
Investigation of Abuse Allegations

Mathis testified that he "cannot recollect" if there is a written document concerning reassigning an employee. (Mathis Depo. 86.) Liles has sole authority over whether an employee is reassigned. Mathis testified that he understands that there is a written criteria or time frame for completing an investigation of a CTS being accused of client abuse. (Mathis

---

[10]The defendant disputes this fact, saying that "Mike Mathis has stated that there have been white MHW I's fired in the last four years, but he could not recall their names. He said that he could recall one situation where a white employee was terminated for a particularly egregious offense." (Doc. 39, p. 5.) However, Mathis did not testify that "there have been white MHW I's fired in the last four years." In response to being asked whether he could "recall any CTS I white workers who [had] been terminated in the last three or four years," he answered, "I remember situations, but I don't remember names, no ma'am." (Mathis Depo. 78.) He goes on to identify only one such situation.

[11]The plaintiffs state, "Denied as to 'supervision'." However, they do not state which use of the word they dispute. Further, the evidence they cite merely refers to the hiring process, not to supervision.

Depo. 89.)  He does not, however, know the time frame for such investigation.  *Id.*

Liles oversees all investigations of client abuse.  (Mathis Depo. 90-91.) Mathis testified that there is not a written criteria for naming the person to investigate disciplinary action that does not involve a client.  It is Liles, however, who names the investigator (Mathis Depo. 106.) and who has final authority on all terminations.

Mathis testified that he is not aware of a written criteria that determines when the Bureau of Special Investigations becomes involved in an investigation. (Mathis Depo. 107.) At least one plaintiff was sent to work in medical records when an allegation of abuse surfaced.  Mathis testified that he cannot recall if "there's been any other employee that's been directed to go to Medical Records and didn't go and the police were called in to investigate it." (Mathis Depo. 104.)  When MHW Is are originally hired to work at Partlow, they are asked about their preference  of work area (Unit) and shift. If there are vacancies in the area and shift requested, the defendant tries to accommodate the employee, unless current employees also want to transfer into those vacancies. After being originally assigned to a particular Unit and shift, MHW I decisions related to transfers to a different Unit or shift are made on the basis of seniority.  (Sykes Affid. 2.)[12]

The decision to assign a particular MHW I to a particular client is made by the supervising MHW II or MHW III, based on factors such as client needs, "call-ins"

_____

[12]The plaintiffs respond to this fact by stating,  "Denied.  In Spring of 2006, Plaintiff Wilson, who was most senior CTS I, was denied a transfer by Wesley Scarritt (white) even though his immediate supervisors consented to the transfer.  (Wilson Depo. P. 56, 61)."  (Doc. 35, p. 4.)  As an initial matter, the cited evidence does not support the phrases "[i]n Spring of 2006" or "even though his immediate supervisors consented to the transfer."  Accordingly, the supported portion of the dispute should read: "Plaintiff Wilson, who was most senior CTS I, was denied a transfer by Wesley Scarritt (white)."  That statement does not conflict with the defendant's version of the facts.

(unexpected absence of staff), the particular strengths of the MHW I, and other facility needs. (Sykes Affid. 2.)[13]

Since November 4, 2005, there have been eight Home Managers at Partlow. Six have been black and one has been white. Since November 1, 2005, there have been 53 individuals occupying the position of Mental Health Worker II. Of that number, all but one person was black. Since November 1, 2005, there have been 26 individuals occupying the position of Mental Health Worker III at Partlow, all of whom were black.

During the period of April 1, 2005 to March 31, 2006, there were 548 MHW Is employed at Partlow. Of that number, 516 were black, 30 were white and 2 were in other racial categories. Thus, 94% of the MHW Is at Partlow were black. During the period of April 1, 2005 to March 31, 2006, there were 223 client incidents at Partlow involving MHW Is. Of that number, 242 involved black MHW Is and 18 involved while MHW Is. Thus, 94% of the incidents during that period of time involved black MHW Is.

<u>Miscellaneous</u>

Regina Poole, a white woman, is in charge of the Employee Assistance Program. The Employee Assistance Program is not a typical avenue to complain about discrimination. (Mathis Depo. 111.)

No investigation was conducted by Mathis when the plaintiffs filed their EEOC charges of discrimination. There is no written criteria that would have prevented Mathis from discussing the complaints of discrimination with other staff members in order to

---

[13]This statement has been disputed by the plaintiffs without citation to evidence. It is therefore deemed to be admitted.

determine their validity.

While Mathis testified that the defendant has a policy on discrimination, he could not state that there was a written policy that set out steps to follow in making a discrimination complaint. (Mathis Depo. 129.)

Mathis testified that he is not aware of a written criteria for establishing a behavioral plan. (Mathis Depo. 147.) He does not know if there is a written criteria for which employees receive CPI training.[14] (Mathis Depo. 151.) Neither does he know whether direct care staff receive training on patient's civil rights, mental retardation versus mental illness, ADD, ADHD, or autism.

There is not a written criteria for conducting a Pre-Disciplinary Action Conference ("PDC") for an employee alleged of misconduct. (Mathis Depo. 160-61.) If Liles receives information that the charges are not warranted, he can decide not to have a PDC. (Mathis Depo. 162.)

If a client received an injury, it is Mathis' understanding that that would justify an incident report. All investigative reports are submitted to Liles.

<u>Janice Boyd</u>[15]

---

[14]The parties do not explain what "CPI training" is.

[15]The plaintiffs offer a number of facts in this section and in every section dealing with a specific plaintiff. Many facts seem "thrown in" by the plaintiffs without a proper context. Some of the facts are supported by the evidence in this case, many are not, and some are partially supported. The court has, to the best of its ability, set out the facts in the light most favorable to the plaintiffs. Many facts have been stricken as unsupported. Others have been rewritten because, as offered by the plaintiffs, they mischaracterize the evidence. If supported, however, they have been retained. However, in an effort to include all offered and supported facts, in the light most favorable to the non-movant, the remainder of the court's facts is, at times, as disjointed as the plaintiffs' version.

Plaintiff Janice Boyd was employed by the defendant at its Partlow facility beginning on September 24, 1990. She was employed as a MHW I. With the exception of a one month period, Boyd has been assigned to work the evening shift — 2:45 p.m. to 10:45 p.m. — on Unit III.. During the approximately eighteen years that Boyd has been employed at Partlow, all of her supervisors have been black persons.[16]

In late 2005, Boyd was hit in the mouth by a client. She was taken to the hospital by Woods, one of the plaintiffs. Boyd's injury required stitches in the emergency room of a local hospital. The physician treating Boyd recommended that she not work for two days. Boyd now has a scar on her lip as a result. During her employment at Partlow, Boyd never requested to transfer to a different area.[17]

Clients at Partlow are assigned "behavioral support plans." While the parties have not set out exactly what these plans are, the evidence that is cited implies that these plans include both risk and behavior assessments for individual clients, as well as a plan for dealing with behavioral issues. Psychiatrists, psychologists, and Unit directors (collectively "the team")

---

[16]This statement is disputed by the plaintiffs, based on their assertion that "Mr. Liles has sole authority for the hiring process" and "has complete firing and disciplinary authority over CTS'." (Doc. 35, p. 5.) This assertion has nothing to do with Ms. Boyd's immediate supervisors.

[17]The plaintiffs state:

46.    The reason the client who attacked Boyd was not restrained by the psychiatrist (white) was because of his race. (Boyd Depo. P. 96)

(Doc. 35, p. 20.) As an initial matter, it is unclear whether this statement refers to the race of the psychiatrist, or the client. Further, the evidence cited by the plaintiffs does not support the statement. The evidence cited does not mention the race of either the psychiatrist or the client. Instead, Boyd states that she "feels like" things would have been different if she had been a white female. The statement is STRICKEN.

devise the behavior plans for clients. (Boyd Depo. 59.) Regardless of the plan, or the client's problems, in order for a Mental Health Worker to institute a four-point restraint, she "ha[s] to call the psych[iatrist] or the Q . . . and ask them." (Boyd Depo. 57.) Boyd feels that the behavioral support plans that were implemented since 2003 are not effective. (Boyd Depo. 134.)[18] Boyd discussed with a psychiatrist, on 40 to 50 occasions, behavior plans concerning client CA. (Boyd Depo. 140.)[19]

Boyd complains of a number of incidents that she says were racially motivated. First, she recounts a time when Denise Wolfe, a white person, was allegedly sexually assaulted by a client.[20] Boyd states that that client was permanently removed from Wolfe's presence. Boyd was sexually assaulted by this client at least 50 to 75 times, and possibly as many as 100 times, from 1998 to 2005. (Boyd Depo. P. 71)[21] Boyd put a record in the client's chart on the majority of the occasions when she was sexually assaulted. Boyd had previously

_____

[18]The plaintiffs' original statement reads:

The behavioral support plans that were implemented since 2003 where implemented by all white psychiatrist except for one black and are not effective. (Boyd Depo. P. 134)

(Doc. 35, p. 20.) The language "were implemented by all white psychiatrist except for one black and" makes no sense. Further, that language is not support by the record citation. It is therefore STRICKEN.

[19]The plaintiffs offer this fact but does not identify the client as CA, explain who client CA is, or state client CA's relevance to this action. It is the defendant who points out that CA is to whom the plaintiffs refer. Still, who "CA" is and why that client is important to this case is not explained.

[20]There is no indication that this was the same client who caused Boyd to need stitches, or that this was client "CA".

[21]The plaintiff has added the phrase "and nothing was done about it." There is nothing in the cited evidence to support that statement. That language is therefore STRICKEN.

complained that she had been sexually assaulted by the same client. The client was not removed from Boyd. (Boyd Depo. 65-66.) Wesley Scarritt, a white man, was the unit director when Boyd and Denise Wolfe were attacked. His supervisor, Larry Vail, is also white.

Next, Boyd complains that she was required to work with more dangerous clients than a white person she identifies as Ms. Parker. (Boyd Depo. 83-84.)[22] There are several dual-diagnosed clients with a propensity for violence who go to Taylor Hardin, and Boyd is required to work with them. Also, Boyd complains that she has been called the "N" word by clients, and she was still required to work with them. (Boyd Depo. 95.) Further, Boyd does not feel that she was adequately trained in protecting herself against client attacks. (Boyd Depo. 130.)[23] Boyd was never instructed to record threatening behavior in a client's chart.

Boyd complained to Wesley Scarritt, a white unit director, about racial discrimination. Scarritt told Boyd that there was nothing he could do about it because "Glenn Sparks had went over his head, and that they had directed him." (Boyd Depo. 142.) MHW II and MHW III supervisors do not have final authority over which clients staff members are assigned to. (Boyd Depo. 144.)[24] When asked if "white coworkers are allowed to restrain

----

[22]The plaintiffs do not more identify Ms. Parker more specifically. The original version of this fact, as offered by the plaintiffs, stated that Parker was not required to work with dangerous clients. The court has altered this statement to reflect the testimony accurately.

[23]The plaintiff originally cast this fact as simply, "Boyd did not receive adequate training." (Doc. 35, p. 20.) That statement, like many others by the plaintiffs in this matter, is a mischaracterization of the evidence cited.

[24]The defendant denies this fact, offered by the plaintiffs, but includes only a general reference to the deposition of Patricia Sykes.

more than the black staff," the plaintiff testified, "I would say yes." (Boyd Depo. 145.) Boyd has been affected negatively and suffered stress due to what she calls racial discrimination by the defendant. (Boyd Depo. 93.)

Vera Carr

Plaintiff Vera Carr, who is black, was employed by the defendant at its Partlow facility on June 22, 1998, as a MHW I. In November, 2006, Carr was promoted to the position of MHW II. Carr continues to be employed at Partlow. The entire time she has been employed at Partlow she has worked in Unit II on various shifts. Other than one supervisor in 2003 and 2004, all of Carr's supervisors during the approximately ten years that she has been employed at Partlow have been black.[25]

On August 20, 2005, a finger on Carr's left hand was bitten by a client, ultimately resulting in the amputation of the top portion of that finger. Carr received compensation from SEICTF for this injury. Originally, she decided that she did not want to transfer to a different Unit or work with a different group of clients. When Carr returned to work after being off for two months and three days, she requested to be removed from the group the client was in, but her request for a transfer was denied.[26] She was required to work with the client who had attacked her. (Carr Depo. 70.)[27]

---

[25]This statement is disputed by the plaintiffs based on their assertion that "Mr. Liles has sole authority for the hiring process" and "has complete firing and disciplinary authority over CTS'." (Doc. 35, p. 5.) This assertion has nothing to do with Ms. Carr's immediate supervisors.

[26]The original version of this fact, offered by the plaintiffs, included the words "by Mike Mathis" at the end of this statement. Nothing in the cited evidence supports that statement.

[27]The plaintiffs state:

A white staff member, Debbie Hubbard, told Carr that Hubbard was not required to work with certain clients who are difficult or violent that Carr was required to work with. (Carr Depo. 112-116.)[28]

Carr received two written disciplinary actions on December 3 and 13, 2007 from Vance Liles, Facility Director, which resulted in Carr receiving 7 points off her evaluation. (Carr Depo. 148-49.)

Carr wrote a letter to Commissioner Houston on January 7, 2006. (Carr Depo. 14.)[29]

<u>Tammy Clark</u>

Plaintiff Tammy Clark, who is black, was originally employed as a MHW I at the defendant's Partlow facility on June 1, 1999. She resigned on September 25, 1999 to take a position with another state agency. During this period of time she worked on Unit III.

During her first period of employment at Partlow, all of Ms. Clark's supervisors were black. She was again hired as a MHW I at Partlow on September 19, 2005, and resigned on November 10, 2005. During this period of time she worked in Home 6. During Clark's

---

5. The Defendants were aware that the client that bit Carr's finger off had previously bit a staff's finger, at another facility. (Carr Depo. P. 108)

(Doc. 35, pp. 21-22.) Nothing in the cited evidence supports that statement. It is therefore STRICKEN.

[28]The plaintiffs' original fact inserted the words "racially motivated" here. There is nothing in the cited evidence which supports such a statement.

[29]The original version of this fact, offered by the plaintiffs, added the language "complaining of racial discrimination" at the end of this sentence. (Doc. 35, p. 21.) Nothing in the cited evidence supports that statement.

second period of employment at Partlow, all of her supervisors were black.[30]

Clark was employed at Partlow on a third occasion on April 17, 2006, and resigned on May 10, 2006. She was employed in the classification of MHW I, but worked as an administrative assistant. Her supervisor was white. Immediately prior to her employment at Partlow on April 17, 2006, Ms. Clark had worked at Partlow through a temporary agency for a brief period of time with the same duties and in the same location.

During Clark's second period of employment at Partlow, on November 5, 2005 Clark was injured by a client and required to be hospitalized overnight. (Clark Depo. 19, 92.) She suffered a cervical spine sprain after the client pushed her against a door. Clark had been working in a home with six male clients. (Clark Depo. 83, 92.) When the client became combative, Clark asked for assistance to help with the client, but no one assisted her until after she was injured. (Clark Depo. 83-86.) Clark's injuries caused her to miss approximately one week of work followed by three days of light duty. Clark requested a transfer to a different area after her injury, and she was permitted to transfer.

On December 13, 2005, Ms. Clark signed a Voluntary Petition in the United States Bankruptcy Court for the Northern District of Alabama seeking protection pursuant Chapter 13 of the federal bankruptcy law. On November 5, 2006, Ms. Clark filed a claim with the Equal Employment Opportunity Commission, as a precursor to filing this lawsuit. Clark's Bankruptcy Court case was terminated on April 29, 2008, but a review of the case document

---

[30]This statement is disputed by the plaintiffs, based on their assertion that "Mr. Liles has sole authority for the hiring process" and "has complete firing and disciplinary authority over CTS'." (Doc. 35, p. 5.) This assertion has nothing to do with Ms. Clark's immediate supervisors.

indicates that Clark never amended her list of assets to include the claim she is making in this lawsuit.

On July 9, 2008, Clark signed another Voluntary Petition in the United States Bankruptcy Court for the Northern District of Alabama, seeking protection pursuant Chapter 13 of the federal bankruptcy law. Ms. Clark did not include this lawsuit in her list of assets.

Andrea Green, a white person, was not required to work with six all-male clients in the home where Clark received her injuries. (Clark Depo. 103, 116.) There is not another home that has six male clients. (Clark Depo. 137.) Two of Clark's requests for transfers were denied. One request was made before her injury.[31]

<u>Brenda Harris</u>

Plaintiff Brenda Harris was employed by the defendant at its Partlow facility on July 6, 2001, as a MHW I. She continues to be employed at Partlow in the same position. Except for approximately her first year, Harris has worked in Unit III for the entire period of her employment. She has worked the evening shift for the entire period of her employment. All

---

[31]The plaintiffs state:

> 7.    Assignments of staff to clients come from the top management. (Clark Depo. P. 111)

(Doc. 35, p. 23.) The evidence cited does not support this statement. It is therefore STRICKEN. Further, the plaintiff states:

> 8.    Supervisors have told Clark that they cannot handle assignment requests, because the decisions come from upper management. (Clark Depo. P. 119)

(Doc. 35, p. 23.) This statement is based entirely on hearsay and is therefore STRICKEN.

of her supervisors have been black.[32]

In 2004, a client hit Harris and tried to pull her hair. She sought medical attention, but was found to have no injuries.  On January 24, 2006, a client came toward her with a coat hanger and pushed her. A co-worker intervened and Harris was not injured.  On April 11, 2006, a client hit  Harris on the arm and pulled her hair. She went to a local hospital emergency room for treatment for a bruised arm and strained neck. Harris returned to work the next day and was on light duty for two weeks.

At some point the parties agree that Harris was suspended.  Neither party has stated the reason for or the time of her suspension. However, it is undisputed that the suspension was eventually overturned.[33]

Harris testified to feeling depressed and sleepless.[34]  Since Harris has been employed, she has received five training sessions regarding dealing with aggressive or combative clients.

---

[32]This statement is disputed by the plaintiffs, based on their assertion that "Mr. Liles has sole authority for the hiring process" and "has complete firing and disciplinary authority over CTS'." (Doc. 35, p. 5.)  This assertion has nothing to do with Ms. Boyd's immediate supervisors.

[33]The plaintiffs further state:

2.     Had Harris been white, she would not have been transferred to the switchboard for three weeks after accusations of client abuse. (Harris Depo. P. 96 - 98)

(Doc. 35, p. 23.)  Not only is this a conclusory statement going to one of the ultimate issues in the case, there is also no basis for such a statement in the evidence cited other than Harris's opinion.  This statement is STRICKEN.

[34]The original fact cited by the plaintiffs states:

3.     The racial discrimination that Harris suffered caused her to be  depressed, stressed and sleepless.  (Harris Depo. P. 99)

(Doc. 35, p. 23.)  The page of Harris' deposition cited does not mention depression and stress.

Two of the sessions were after her EEOC charge was filed and did not last over an hour and a half.[35]   (Harris Depo. 100-102.)

Harris was attacked by one client three times and another client one time.[36] When Harris returned the first two times after her injuries by clients, she was required to work with the client that attacked her.  (Harris Depo. 105.)  After the third time she was attacked, she was transferred to the float pool.  (Harris Depo. 105.)[37]

Harris was asked in her deposition to describe everything that she felt contributed to a hostile work environment.  She testified only that "the way that I see that and answer is that they never put anybody white with this particular client, with RS." (Harris Depo. 57.)[38]

---

[35]The original fact offered by the plaintiffs merely state that Harris had received only five training sessions and did not specify what the training was for.  Even though this fact was admitted, the court, on its own, had to review the record to determine the specifics of the statement.

[36]The plaintiffs state:

5.      Harris was attacked by one client three times and another client, who management knew had a propensity of violence toward black people, one time. (Harris Depo. P. 103, 109)

(Doc. 35, pp. 23-24.) The plaintiffs offer no foundation for Harris' opinion that "management knew" these individuals had a propensity for violence. The statement is STRICKEN.

[37] The original version of these last two sentences, offered by the plaintiffs, reads:

6.  Each time Harris returned each time after her injuries, she was required to work with the client that attacked her.  (Harris Depo. P. 105)

(Doc. 35, p. 24.)  The evidence does not support the statement as originally offered by the plaintiffs.

[38] The original version of this fact, offered by the plaintiffs, stated:

8.      Similarly situated whites (Carmen Wright, Jeremy Blackwood, and Elizabeth (LNU), were not put with the client that attacked Harris.  (Harris Depo. P. 58)

In 2005 plaintiff Jessie Jones was employed as an MHW I and continues to be employed at Partlow in the same position. Jones started his Partlow employment in Home III and continues to be employed in Home III at this time. During Jones' employment, all of his supervisors have been black.

On June 6, 2006, Jones was injured by a client as Jones was attempting restrain him. Jones was treated in a local hospital emergency department where his head was stitched. He also required surgery on a shoulder which was injured in the incident. Jones received compensation from SEICTF for this on-the-job injury. He never asked to be transferred to a different Unit.

Jones testified that he suffers from headaches, shoulder pain, and loss of sleep as a result of the defendant's actions. (Jones Depo. 105-06.)[39] Initially, upon returning to work, Jones was assigned to a client other than the one who injured him. Eventually, about three months later, Mr. Jones was assigned to the client who injured him.[40]

---

(Doc. 35, p. 24.) The evidence cited makes no mention of these individuals.

[39]The plaintiffs state:

2. Jones underwent shoulder surgery for his first injury from a client attack in May, 2006 and his second injury in March, 2008. (Jones Depo. P. 107-08)

(Doc. 35, p. 24.) There is nothing in the evidence cited about any surgery.

[40]The plaintiffs' original version of this fact read:

3. After Jones attacked, [sic] he was required to continue to work with the same clients upon his return to work. (Jones Depo. P. 109-10)

(Doc. 35, p. 24.) The plaintiffs likely mean, "After Jones was attacked." Still, such a

<u>Mitchell Lilly</u>

Plaintiff Mitchell Lilly worked as an MHW I at the defendant's Partlow facility from October, 2002 to June, 2006. From June, 2006 to July, 2007, he worked as a Mental Health Worker I at the defendant's Taylor Hardin Secure Medical Facility. During his employment at Partlow, Lilly worked on Unit III. During Lilly's employment at Partlow, all of his supervisors have been black.[41]

In 2003, Mr. Lilly fell in a van at Partlow while attempting to break up a fight between two clients. He injured his back, received medical attention, and was on light duty for a period of time. In March, 2005, a client scratched Lilly on the chest. Lilly sought medical attention at the emergency department of a local hospital and later received injections and testing for infectious diseases; the tests were negative.

In March, 2006, a client scratched Lilly in the eye. Lilly sought medical attention at

---

statement implies that Jones was assigned to the same client <u>immediately</u> and <u>initially</u> upon his return to work. The evidence does not support such a statement. The plaintiffs also state:

4. Jones complained about having to work with the same clients who attacked him and nothing was done. (Jones Depo. P. 110, 112)

(Doc. 35, pp. 24-25.) The evidence cited by the plaintiffs in support of this statement reflects that Jones was given a different client after he complained, not that "nothing was done". This statement is STRICKEN. The plaintiffs next state:

5. Jones's request to be transferred away from the client was denied. (Jones Depo. P. 112)

(Doc. 35, p. 25.) Jones himself, at the very page cited <u>by the plaintiff</u> states that he <u>was</u> given another patient. Further, he also testifies on that page that he did not ask to <u>never</u> work with that client again.

[41]This statement is disputed by the plaintiffs based on their assertion that "Mr. Liles has sole authority for the hiring process" and "has complete firing and disciplinary authority over CTS'." (Doc. 35, p. 5.) This assertion has nothing to do with Ms. Lilly's immediate supervisors.

the emergency department of a local hospital and ultimately received testing for infectious diseases; again, the tests were negative. Lilly was not required to miss work. Lilly did not request to be transferred following the incidents with clients described above.

On November 4, 2002, Lilly signed a Voluntary Petition in the United States Bankruptcy Court for the Southern District of Alabama, seeking protection pursuant Chapter 13 of the federal bankruptcy law. On November 5, 2006, Lilly filed a claim with the Equal Employment Opportunity Commission, as a precursor to filing this lawsuit.[42]

<u>Lavotha Raby</u>

Plaintiff Lavotha Raby was employed by the defendant at its Partlow facility on January 12, 2004, as an MHW I. She continued to work at Partlow as an MHW I until her employment was terminated on September 20, 2006. On July 17, 2006, Raby was accused by a client of abuse. She was assigned to work at the Partlow switchboard while the matter was investigated. Raby's employment was terminated by a letter, dated September 20, 2006, from Partlow Director, Vance Liles. Because Raby was terminated by Partlow, she lost her car and her ability to provide for her family. (Raby Depo. 199.) The termination letter stated that Ms. Raby was being terminated for refusing repeated directives to report to the Partlow switchboard during the investigation. Raby appealed her termination to the State of Alabama Personnel Board. By order dated January 7, 2007, her termination was upheld. During the entire time of her employment at Partlow Raby worked on Unit III on the evening shift.

---

[42]The defendant also writes, "Lilly's Bankruptcy Court case was terminated on December 3, 2008, however, a review of the Bankruptcy Court documents indicates that he never amended his list of assets to include the claim he is making in this lawsuit." (Doc. 29, p. 18.) However, the defendant does not cite to evidence in support of this statement. It is therefore STRICKEN.

During Raby's employment at Partlow, all of her supervisors were black.[43]

During the course of Raby's employment at Partlow she was involved in a number of incidents during which she states she was hurt by clients. Most of these events did not cause her to miss work. In some instances she received compensation from SIECTF for on-the-job injuries.[44]

Raby gave a statement to a member of the media regarding the alleged hostile work environment at Partlow. (Raby Depo. 232.)[45] On July 15, 2006, after giving that statement, Raby was "written up" and reassigned.

---

[43]This statement is disputed by the plaintiffs, based on their assertion that "Mr. Liles has sole authority for the hiring process" and "has complete firing and disciplinary authority over CTS'." (Doc. 35, p. 5.) This assertion has nothing to do with Ms. Raby's immediate supervisors.

[44]The plaintiffs state:

1.      Plaintiffs are put into adverse positions because of their race by the Commissioner and the Director of the Facility because they do not care if blacks are treated adversely. (Raby Depo. P. 166, 168, 173)

(Doc. 35, p. 25.) This conclusory statement is mere opinion, lacks foundation, and goes to the ultimate issue in the case. It is STRICKEN. The plaintiffs next offer:

2.      Plaintiffs are not trained to be able to deal with the clients at Partlow. (Raby Depo. P. 168)

(Doc. 35, p. 25.) Nothing in the evidence cited supports this statement. It is STRICKEN.

[45]The original version of this fact, offered by the plaintiffs, states:

3.      Plaintiff gave a statement to the Tuscaloosa News regarding the hostile work environment at Partlow on March 15, 2006, and on three occasions in September, 2006. (Raby Depo. p. 232)

(Doc. 35, p. 25.) Nothing in the evidence cited mentions the Tuscaloosa News, the number of times Raby spoke to the news, or the dates of the statements.

Raby states that she was told by training officials and upper management to "run" if a client becomes combative. (Raby Depo. 218.)[46]

<u>Sarah Ann Salters</u>

Plaintiff Sarah Ann Salters was employed by the defendant at Partlow in February, 2004 as an RN II, and continues to be employed at Partlow in the same position. Salters started her Partlow employment on the night shift, 10:30 p.m. to 6:30 a.m., and she remains on the night shift. There are one or two other RNs assigned to the night shift with Salters. There are never more than three RNs assigned to work on the night shift. In performing her duties, Salters rotated around the various Units at Partlow until late 2006, when she was assigned to work in specific buildings (Homes 2, 7, 6 and 10). During Salters's employment at Partlow, all of her supervisors have been black.[47]

In March of 2006, a Partlow client struck Salters and threw a telephone at her (which hit her in the back). She sustained an injury to her back which required that she be on light duty for a period of time. Salters received compensation from SIECTF for on-the-job injuries.

<u>Terry Wilson</u>

Terry Wilson was employed at Partlow in 1975 as an MHW I, and he continues to be

---

[46]The plaintiffs offer the following fact:

9.      Investigations into alleged client abuse are not investigated properly or in a timely manner. (Raby Depo. P. 220)

(Doc. 35, p. 26.)  There is no support in the cited evidence for such a broad and conclusory statement.  It is therefore STRICKEN.

[47]This statement is disputed by the plaintiffs. They assert that "Mr. Liles has sole authority for the hiring process" and "has complete firing and disciplinary authority over CTS'." (Doc. 35, p. 5.) This assertion has nothing to do with Ms. Salters's immediate supervisors.

employed in that position. Wilson has been assigned to the second shift (2:15 p.m. to 11:00 p.m.) for the entire period of his employment at Partlow. He has never requested to be assigned to a different shift. Since at least January of 2002, Wilson has worked in Unit III at Partlow, though he has been assigned to different Homes in that Unit. Wilson has described one incident in 2004 where a client scratched his eye, and he was off work five days as a result.

In the fall of 2004, when his clients were moved from Home 10 to Home 7, Wilson was also moved from Home 10 to Home 7. (Wilson Depo. 44.) He testified that this move was involuntary. (Wilson Depo. 44.)

Wilson testified that Wesley Scaritt, who is white, "intervened . . . and saw to it that I had to start working with Jeremy K." (Wilson Depo. 49.)[48] Wilson's cornea was injured by Jeremy K. in June, 2006. Wilson testified that when he returned from the attack, he "was once again assigned to work back with Jeremy K." (Wilson Depo. 113.) Wilson's direct supervisors told him that they were instructed by Scarritt to assign him with Jeremy K. (Wilson Depo. 121.) Thereafter, Jeremy K. alleged that Wilson hit him, and Wilson was reassigned to the switchboard for two weeks.

Wilson testified that the reassignment room of the switchboard area is approximately

---

[48]Plaintiffs' original fact stated that this was done "because of his propensity for violence." The citation offered for this fact does not support that statement. The next fact statement offered by the plaintiffs states, "4. In the Fall, 2004, Wesley Scarritt (white) moved Plaintiff Wilson to work with a particular client, Jeremy K., who had a high propensity for violence. (Wilson Depo. P. 64)" (Doc. 35, p. 14.) Nothing in the cited reference discusses Jeremy K. Since the plaintiffs' statement is not supported by the record, it is STRICKEN.

"five-by-eight."[49]   (Wilson Depo. 126.)   Wilson testified that white employees are not re-assigned when allegations of client abuse are made. (Wilson Depo. 128.)

Liz Martin, a white woman, allowed a client to leave the premises and was not reassigned. (Wilson Depo. 136.)[50]  In November, 2006, Tammy Woods, also white, was accused of hitting a client, and she was not reassigned. (Wilson Depo. 139.)   Wilson also testified that Glenn Sparks, a white person, was not "initially" reassigned after he broke a client's arm in two places because the client allegedly spit on him.   (Wilson Depo. 141-144.)[51]

---

[49]While Wilson clearly was referring to the area of the room, he did not state whether the stated dimensions were in feet, yards, or some other unit.

[50]The defendant notes that Wilson, when asked whether Martin received any discipline, stated, "None that I am aware of."  (Doc. 47, p. 3, citing Wilson Depo. 137.)  However, the fact offered by the plaintiffs has to do only with whether Martin was reassigned, not whether she was ultimately disciplined.

[51]The plaintiffs state:

13.    Glenn Sparks does not have a required Masters Degree for his position. (Wilson Depo. P. 145)

(Doc. 35, p. 15.) Wilson, later in his deposition, states that the only basis for this knowledge is that he saw Sparks' B.S. degree hanging on the wall, and that he heard people say that that was all he had.  Further, the plaintiffs provide no foundation in support of the assertion that a master's degree was required for Sparks' position. Also, there is no indication of relevance. This statement is STRICKEN.

Next, the plaintiffs state:

14.    After Plaintiff Wilson complained about a client's, Cecil A., health condition, [Dr. Woods (white) and Chuck Gillis (white) refused to seek medical attention for the client which almost resulted in his death. (Wilson Depo. P. 148)

(Doc. 35, p. 16.) The cited reference does not support this fact statement.  This proposed fact statement is STRICKEN.

Plaintiff Wilson testified that he and Constance May, who is a black person, were reassigned and disciplined because they complained about a client's lack of medical treatment. (Wilson Depo. 149.) Wilson testified that Dale McDaniel, a white person, was accused of attempting to have sex with a patient, and was not reassigned. (Wilson Depo. 150-51.) Wilson also testified that Mitchell Lilly, one of the plaintiffs, was accused by a client of attempting to have sex with the client, and he was reassigned for two weeks. (Wilson Depo. 151-152.) Wilson continues to have blurred vision due to his cornea injury. (Wilson Depo. 116.)[52]

---

[52]The plaintiffs state:

19.     Jeremy Blackwood (white) CTS I complained to Mr. Liles and Wesley Scarritt was not required to work with client, Jeremy K. (Wilson Depo. P. 108-09)

(Doc. 35, p. 16.) This purported fact makes no sense and is hereby STRICKEN. Further, the plaintiffs state:

20.     In Spring, 2006, Plaintiff Wilson was denied a transfer by Wesley Scarritt (white) even though his immediate supervisors consented to the transfer. (Wilson Depo. P. 56, 61)

(Doc. 35, p. 16.) Wilson states that the basis for this statement is that he was told by Archie Smith that Scarritt was moving him. (Wilson Depo. 60-61.) The statement therefore is merely Wilson's opinion, based on hearsay. Accordingly, the statement is STRICKEN. The plaintiffs also state:

21.     Wesley Scarritt retaliates against Plaintiff Wilson because he is black and because he testified against Scarritt in another lawsuit Plaintiff had against the Department. (Wilson Depo. P. 68)

(Doc. 35, p. 16-17.) This statement is conclusory, goes to the ultimate issue in the case, and is mere opinion. It is hereby STRICKEN.

The plaintiffs further state:

22.     Archie Smith, Plaintiff Wilson's direct supervisor, told him that Scarritt was discriminated against Plaintiff Wilson. (Wilson Depo. P. 68)

Plaintiff Wilson has received only one in-service training session on dealing with aggressive clients. (Wilson Depo. 99-100.)[53]

After Wilson was told that Scarritt wanted him moved out of 10A, he wrote letters directly to Scarritt, Liles, and the Commissioner, complaining of racial discrimination.

Plaintiff Wilson's Charge of Discrimination was filed May 2006.[54]

---

(Doc. 35, p. 17.) This statement makes no sense. If the statement meant to say "told him that Scarritt discriminated against Plaintiff Wilson," it is hearsay. The statement is STRICKEN.

[53] This sentence was offered by the plaintiffs in their fact statement. However, its original form read: "Plaintiff Wilson has only received one in service training." The court has changed it to accurately reflect the plaintiff's testimony. The plaintiffs further state:

27. Plaintiff Wilson's complaints of abuse and discrimination were not properly investigated. (Wilson Depo. P. 226)

(Doc. 35, p. 17.) First, this is a mere conclusory statement of opinion by the plaintiffs, which goes to one of the ultimate issues in the case. Further, the cited evidence does not state that the complaints were not properly investigated, only that Wilson did not agree with the results of the investigation. The statement is STRICKEN.

The plaintiffs next assert:

28. The lack of attention to Plaintiff Wilson's complaints of discrimination and abuse was in retaliation for his previous lawsuit. (Wilson Depo. P. 227)

(Doc. 35, p. 17.) The plaintiffs offer nothing more than Wilson's own opinion in support of this statement. Further, this conclusory statement goes to one of the ultimate issues in the case. It is therefore STRICKEN. The plaintiffs next state:

29. CTS II and III receive shift assignments directly from Wesley Scarritt (white). (Wilson Depo. P. 235)

(Doc. 35, p. 17.) The evidence cited by the plaintiffs does not discuss CTS IIs and IIIs. This statement is therefore unsupported by the evidence and is STRICKEN.

[54]The plaintiffs state:

24. Clients are Partlow are mis-diagnosed and do not receive proper treatment. (Wilson Depo. P. 96-97)

<u>Parthenia Woods</u>

Plaintiff Parthenia Woods was hired at the Partlow facility in May of 2000, as an MHW I. In August 1, 2008, she was promoted to the position of Mental Health Worker II. With one exception, all of Woods' direct supervisors have been black persons.[55]

When Woods was originally employed at Partlow, she was assigned to work on Unit I. In July of 2003, at her request, Woods was moved to Unit III, where she continues to work. During the course of Woods' employment at Partlow she was involved in three incidents in which she states she was hurt by clients. Woods sought medical care on each occasion, but it was not necessary for her to miss work.

On February 6, 2006, Woods signed a Voluntary Petition in the United States Bankruptcy Court for the Northern District of Alabama seeking protection pursuant Chapter 13 of the federal bankruptcy law. On November 5, 2006, she filed a claim with the Equal Employment Opportunity Commission, as a precursor to filing this lawsuit.[56]

---

(Doc. 35, p. 17.) There is no basis in the cited materials for such a statement. First, Wilson stated only that he "feels like a lot of them are mis-diagnosed and unnecessarily being put out there for some of us to work with." (Wilson Depo. 96.) Further, the statement is mere opinion offered by the plaintiff, a lay witness. No showing has been made that he is an expert on this subject, or qualified to render such an opinion. The statement is STRICKEN. For the same reason, the following statement of fact, also offered by the plaintiffs, is STRICKEN:

25.     Partlow is not set up to deal with the more mental ill clients. (Wilson Depo. P. 99)

(Doc. 35, p. 17.)

[55]This statement is disputed by the plaintiffs, based on their assertion that "Mr. Liles has sole authority for the hiring process" and "has complete firing and disciplinary authority over CTS'." (Doc. 35, p. 5.) This assertion has nothing to do with Woods' immediate supervisors.

[56]The defendant also writes, "A review of the Bankruptcy Court documents indicates that Ms. Woods has not amended her list of assets to include the claim she is making in this lawsuit." (Doc.

<u>James Young</u>

James Young was employed at the Partlow facility in 1991 as an MHW I. Young was seriously injured on March 12, 2006, when he was hit on the head by a client. Young has not worked at Partlow since that date, and is currently receiving regular payments from SEICTF. Young worked on Unit III on the evening shift for most of the time he was employed at Partlow. He never requested transfer to a different Unit or shift. At the time of Young's injury, all of his supervisors were black.[57] These supervisors selected the clients with whom Young was to work.

## ANALYSIS

The remaining counts that are now before the court allege violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and of 42 U.S.C. § 1981.

### *Section 1981 Claims*

As to the plaintiffs' claims under 42 U.S.C. § 1981, the Eleventh Circuit states:

"The Eleventh Amendment to the Constitution bars federal courts from entertaining suits against states." *Abusaid v. Hillsborough County Bd. of County Comm'rs*, 405 F.3d 1298, 1302 (11th Cir.2005). "[I]n the absence of consent[,] a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). The Amendment provides that:

The Judicial power of the United States shall not be construed to extend to any suit in law of equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

---

29, p. 22.) However, the defendant does not cite to evidence in support of this statement. It is therefore STRICKEN.

[57]This statement is disputed by the plaintiffs based on their assertion that "Mr. Liles has sole authority for the hiring process" and "has complete firing and disciplinary authority over CTS'." (Doc. 35, p. 5.) This assertion has nothing to do with Mr. Young's immediate supervisors.

U.S. Const. amend. XI. "Although, by its terms, the Eleventh Amendment does not bar suits against a state in federal court by its own citizens, the Supreme Court has extended its protections to apply in such cases." *Abusaid*, 405 F.3d at 1303. The Eleventh Amendment is no bar, however, where (1) the state consents to suit in federal court, or (2) where Congress has abrogated the state's sovereign immunity. *Port Authority Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990).

*Alyshah v. Georgia*, 239 Fed. Appx. 473, 474 (11th Cir. 2007). In *Alyshah*, the Eleventh Circuit held that the plaintiff's section 1981 claim could be dismissed as against the state of Georgia where that state has not abrogated its sovereign immunity as to such claims. Similarly, the plaintiffs in this case have not shown that the State of Alabama has abrogated its immunity in such cases. Accordingly, the section 1981 claims are due to be dismissed.

### *Title VII Claims*

All that remains of the complaint are the Title VII claims encompassed in Counts One, Two, and Three. Count One alleges race discrimination. Count Two alleges retaliation, and Count Three alleges a hostile work environment. The court will address each of these claims separately.

### Count One

### Race Discrimination

In *Reeves v. DSI Sec. Services,* 331 Fed. Appx. 659, 662, (11th Cir. 2009), the Eleventh Circuit set out the now well-settled law of discrimination as follows:

Title VII explicitly prohibits discrimination against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). To prevail on a Title VII claim, a plaintiff must present (1) direct evidence of discrimination or (2) circumstantial evidence that creates an inference of discrimination. *Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 827-28 (11th Cir.2000). A plaintiff may also establish a prima facie case of discrimination by

32

> presenting statistical proof of a pattern of discrimination. *Hawkins v. Ceco Corp.*, 883 F.2d 977, 985 (11th Cir.1989).
>
> Claims of racial discrimination based on circumstantial evidence are normally evaluated under the three-part, burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *see also Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir.2006). In *McDonnell Douglas*, the Supreme Court held that if an employee presents a prima facie case of racial discrimination against an employer, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 93 S.Ct. at 1824. The employee retains the ultimate burden of proof throughout the proceedings and must be given a fair opportunity to rebut the employer's reason with evidence that the explanation offered by the employer was a pretext for racial discrimination. *Id.* at 1825-26.
>
> In order to present a prima facie case, an employee may "show that: (1)[he] is a member of a protected class; (2)[he] was subjected to an adverse employment action; (3)[his] employer treated similarly situated employees outside of [his] protected class more favorably than [he] was treated; and (4) [he] was qualified to do the job." *Burke-Fowler*, 447 F.3d at 1323. A prima facie case must be supported by "facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997). An adverse employment action is one that involves a serious and material change in the terms, conditions, or privileges of one's employment. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir.2001). "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling." *Id.* at 1239. Rather, a reasonable person must find the action to be materially adverse. *Id.*

*Reeves v. DSI Sec. Services,* 331 Fed. Appx. 659, 662, (11th Cir. 2009).

There are eleven plaintiffs in this action. None of the counts of the complaint identifies specific plaintiffs. Accordingly, the court assumes that Count One is brought on behalf of all plaintiffs.

In the plaintiffs' response to the motion for summary judgment, they make little, if any, effort to establish a prima facie case. The plaintiffs' argument begins with a footnote which sets out a number of facts, without reference to the evidence. Many of these "facts" are simply conclusory statements, without foundation, which go to the ultimate issue in the case.

The court's scheduling order sets out exactly how each party should present its facts. Each party is directed to have a separate section of its brief for facts, labeled as such. Further, facts are to be set out in separately numbered sentences, with references to the record. Footnote 1 complies with none of these requirements. It is therefore STRICKEN.[58]

Thereafter, all of the plaintiffs argue their combined prima facie case at the same time, making no attempt to set out, or satisfy, the elements as to each plaintiff. The plaintiffs state:

> Throughout Plaintiffs' First Amended Complaint, the Plaintiffs allege that they complained of the lack of training, lack of staffing, negligent patient care, lack of improper [sic] policies and procedures.[59] The Defendants' unwillingness to address Plaintiffs' complaints of discrimination, retaliation, hostile work environment, negligence and mistreatment of patients, directly caused the Plaintiffs to be harmed physically, emotionally and financially.

(Doc. 35, p. 27-28.) The plaintiffs cite no specific incidents of such conduct. Further, the plaintiffs' reference to the complaint is inappropriate. Rule 56(e)(2) of the Federal Rules of Civil Procedure states:

> (2) Opposing Party's Obligation to Respond. When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e)(2) (emphasis added). Neither the allegations of the plaintiffs complaint nor the unsupported footnote the court has stricken, satisfy the plaintiffs' burden.

The plaintiffs state:

---

[58]The defendant's reply brief, filed on February 12, 2009, pointed out this deficiency. The plaintiffs have made no effort to correct this error for the last eleven months.

[59]Footnote 1, stricken by the court, originally appeared here. It has been omitted from this quote.

> Additionally, as evidenced by the Statement Of Deficiencies And Plan Of Correction conducted and submitted on November 17, 2008 by the Department of Health and Human Services Centers for Medicaid & Medicare Services, the Defendants' actions or lack of action, caused patients to be harmed. The Defendants' treatment of the patients directly caused the Plaintiffs to be subjected to violence and injuries by the patients.

(Doc. 35, p. 29.) No citation to this "Statement Of Deficiencies And Plan Of Correction" is included. No evidence regarding such a document was presented to the court in the plaintiffs' proposed facts. No explanation of its "findings" is offered, other than conclusory statements. Thus, this paragraph has no probative value.

The next line of the plaintiffs' response simply states, "The Plaintiffs were adversely treated due to racism." (Doc. 35, p. 29.) Again, such conclusory statements do nothing to prove the plaintiffs' prima facie case.

The next section of the Plaintiffs' brief states:

> The Defendants purport that the Plaintiffs, who are employed as CTS I and II, are directly supervised primarily by African-Americans, but this is in direct contradiction to the testimony of Michael Mathis, Personnel Director, who testified that Mr. Liles has complete authority over hiring, discipline, investigations and firing. All personnel reports to Mr. Liles, who makes personnel decisions subjectively instead of based on written objective criteria. The Plaintiffs testified that the decisions as to assignments, discipline and termination were made by upper management.

(Doc. 35, p. 30.) This statement adds nothing to establish the plaintiffs' prima facie case.

Next, the plaintiffs insist that

> [t]here is no written standard for reassigning employees who have been accused of abuse or neglect by a client. (Mathis Depo. P. 84-86) Mr. Liles has sole authority over whether an employee is reassigned. (Mathis Depo. P. 86) There is no written criteria or time frame for completing an investigation of a CTS being accused of client abuse. (Mathis Depo. P. 89)There is no written criteria for who investigates disciplinary action, Mr. Liles determines who is assigned to the investigation. (Mathis Depo. P. 106) There is no written criteria for when the Bureau of Special Investigations gets involved in an investigation. (Mathis Depo. P. 107) There is no written criteria for the steps an employee is suppose [sic] to follow in making a complaint of discrimination.

(Mathis Depo. P. 129) There is no written criteria for establishing a behavioral [sic] plan. (Mathis Depo. P. 147) There is no written criteria for which employees receives CPI training. (Mathis Depo. P. 151) Mathis does not know whether direct care staff receiving training on patient's civil rights, mental retardation versus mental illness or ADD, ADHD or autism. (Mathis Depo. P. 151-52) There is no written criteria or timetable for which employees receive training. (Mathis Depo. P. 155) There is no written criteria for how, when or if a Pre-Disciplinary Action Conference is conducted for an employee alleged of misconduct. (Mathis Depo. P. 160-61) Liles makes the decision of whether a Pre-Disciplinary Action Conference is held for an employee. (Mathis Depo. P. 162) Mr. Liles has final authority on all terminations. (Mathis Depo. P. 131)

(Doc. 35, p. 30-31.) The defendant disputes the assertion that there are no written procedures. Even if the plaintiffs are correct, the lack of written procedures, in and of itself, is not evidence of race discrimination.

The next two sections of the plaintiffs' brief are the only sections which specifically set out examples of the asserted discrimination. The plaintiffs argue:

4. <u>Plaintiffs Are Assigned to Work With Clients Who Have a Known Propensity for Violence</u>.

Plaintiffs testified that they were required to work with clients who had a propensity for violence. Whereas, similarly situated whites, Jeremy Blackwood, Carmen Wright and Elizabeth (LNU) and Debbie Hubbard, were not required to work with clients who had were known to be violent or prejudice. [sic] Upper management had knowledge of the clients who were violent and took no action to remove Plaintiffs who had been previously attacked by them. Additionally, upper management knew that certain clients were prejudice [sic] and took no action to remove Plaintiffs from them even though there imminent [sic] threats of attacks.

5. <u>Plaintiffs Receive Harsher Discipline</u>.

Plaintiffs are reassigned to the switchboard when allegations of client abuse or neglect are made, whereas similarly situated whites are not reassigned. Liz Martin (white) allowed a client to elope off the premises and was not reassigned. (Wilson Depo. P. 136) In November, 2006, Tammy Woods (white) was accused of hitting a client and was not reassigned or disciplined. (Wilson Depo. P. 139) Glenn Sparks (white) was not disciplined after he broke a client's arm in two places because the client allegedly spit on him. (Wilson Depo. P. 142) Dale McDaniel (white) was accused of attempting to have sex with a patient and was not reassigned. (Wilson Depo. P. 150-51) Plaintiff Mitchell Lilly and another black employee were accused by the same client of attempting to have sex with them and they were reassigned for

36

two weeks. (Wilson Depo. P.151)

(Doc. 35, pp. 31-32.)

The plaintiffs' first contention, that they were required to work with clients who had a propensity for violence while similarly situated whites were not, is without merit. The plaintiffs fail to discuss individual plaintiffs at all. In their statement of facts, the plaintiffs provide only evidence that three of the eleven plaintiffs might fall into this category. Those three plaintiffs are Janice Boyd, Vera Carr, and Tammy Clark.

While there is evidence that these three plaintiffs were injured on the job, there is no admissible evidence of similarly situated white employees who were not required to work in these same positions under the same conditions.

> "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997). To show that employees are similarly situated, the plaintiff must establish that the employees are "similarly situated in all relevant respects." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir.2004). The comparator must be "nearly identical" to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer. *Id.*

*Roland v. U.S. Postal Service*, 200 Fed. Appx. 868, 872 (11th Cir. 2006).

Section 4, quoted above, refers only to "Jeremy Blackwood, Carmen Wright and Elizabeth (LNU) and Debbie Hubbard" as comparators. There is no admissible evidence in the record as to the responsibilities or positions of each of these individuals. The statement of facts offered by the plaintiffs do not discuss, even in an inadmissible way, "Jeremy Blackwood, Carmen Wright and Elizabeth (LNU)". The plaintiffs make no attempt to establish that these comparators are nearly identical to any other plaintiff. Only Hubbard is

mentioned in the plaintiffs' facts.

Notably, when the plaintiffs discuss plaintiff Boyd in their statement of facts, an entirely different set of comparators are mentioned. Boyd names Denise Wolfe, and a person named "Ms. Parker." However, there is no admissible evidence in the record as to the responsibilities or positions of each of these individuals. The plaintiffs make no attempt to establish that these comparators are nearly identical to Boyd or any other plaintiff. Further, the plaintiffs offer no specifics as to when and where events concerning each of these individuals occurred. Accordingly, the court is unable to determine whether these events occurred within the allowable time frame of the plaintiffs' Title VII claims.

Debbie Hubbard is identified as a comparator only for plaintiff Carr. Again, though, there is no admissible evidence in the record as to the responsibilities or positions of Hubbard. The plaintiffs make no attempt to establish that this comparator is nearly identical to Carr or any other plaintiff. Further, the plaintiffs offer no specifics as to when and where events concerning Hubbard occurred. The only basis for Carr's contention that Hubbard was not required to work with clients is Carr's testimony that Hubbard told her so. There is no basis, other than this hearsay testimony, for the assertion that Hubbard was not required to work with dangerous clients.

Plaintiff Clark identifies Andrea Green as a comparator. There is no admissible evidence in the record as to the responsibilities or positions of Green. The plaintiffs make no attempt to establish that this comparator is nearly identical to Clark or to any other plaintiff. Further, the plaintiffs offer no specifics as to when and where events concerning Green occurred.

The plaintiffs' argue:

> Upper management had knowledge of the clients who were violent and took no action to remove Plaintiffs who had been previously attacked by them. Additionally, upper management knew that certain clients were prejudice [sic] and took no action to remove Plaintiffs from them even though there imminent [sic] threats of attacks.

(Doc. 35, p. 31.) These allegations alone, without allegations or evidence that similarly situated comparators were treated differently, is insufficient to set out a claim of discrimination.

The plaintiffs next argue that they are "reassigned to the switchboard when allegations of client abuse or neglect are made, whereas similarly situated whites are not reassigned." (Doc. 35, p. 32.) The only plaintiff who is identified as being subject to this treatment is Lilly.[60] The plaintiffs identify Liz Martin, Tammy Woods, Glenn Sparks, and Dale McDaniel as comparators.

The only evidence cited by the plaintiffs that Plaintiff Lilly was reassigned for two weeks is Wilson's testimony. Wilson testified that Lilly told him that he, Lilly, had been reassigned. There is no testimony to this effect from Lilly himself. The only basis for this assertion is Wilson's hearsay testimony.

Further, there is no admissible evidence in the record as to the responsibilities or positions of each of the named comparators. The plaintiffs make no attempt to establish that these comparators are nearly identical to Lilly. Further, the plaintiffs offer no specifics as to when and where events concerning each of these individuals occurred.

---

[60]"Plaintiff Mitchell Lilly and another black employee were accused by the same client of attempting to have sex with them, and they were reassigned for two weeks. (Wilson Depo. P.151)" (Doc. 35, p. 32.)

Based on the foregoing, the plaintiffs have failed to make out a prima facie case of race discrimination under Title VII. Summary Judgment is due to be granted as to Count One.

Count Two

Retaliation

The plaintiffs' brief is clear that the retaliation count has been brought only on behalf of plaintiffs Wilson and Raby.

> "To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that [s]he engaged in statutorily protected activity, [s]he suffered a materially adverse action, and there was some causal relation between the two events." *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir.2008). "After the plaintiff has established the elements of a claim, the employer has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action as an affirmative defense to liability." *Id.* "The plaintiff bears the ultimate burden of proving retaliation by a preponderance of the evidence and that the reason provided by the employer is a pretext for prohibited retaliatory conduct." *Id.*

> The scope of "adverse employment actions" is broader in the anti-retaliation context than in the anti-discrimination context. In the anti-retaliation context, adverse employment actions are those that might dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006). This Court recognized in *Crawford v. Carroll*, 529 F.3d 961, 973-74 (11th Cir.2008), that *Burlington Northern* broadened the type of conduct actionable in a retaliation claim and effectively rejected our previous requirement of showing an ultimate employment decision or substantial employment action to establish an adverse action for a retaliation claim. In order to establish the necessary causal link, "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Goldsmith*, 513 F.3d at 1278 (quotation marks omitted).

*Saunders v. Emory Healthcare, Inc.*, Nos. 09-10283, 09-11530, 2010 WL 65170, * 4 (11th Cir. Jan. 11, 2010).

Plaintiff Wilson testified that he and Constance May, a black female, were reassigned and disciplined because they complained about a client's lack of medical treatment. (Wilson Depo. 149.) Complaining about a client's lack of medical treatment is not statutorily

40

protected activity under Title VII.  Even if it were, the plaintiffs have not established that there is a connection between the two events.

After Wilson was told that Scarritt wanted him moved out of 10A, he wrote letters directly to Scarritt, Liles, and the Commissioner complaining of racial discrimination. Wilson's Charge of Discrimination was filed May 2006.  However, there is no evidence of any adverse action taken against Wilson after the complaint or the EEOC charge, and thus no evidence of retaliation against him.[61]

Plaintiff Raby gave a statement to a member of the media regarding the alleged hostile work environment at Partlow.  (Raby Depo. 232.)  On July 15, 2006, after giving that statement, Raby was "written up" and reassigned.[62]  The plaintiffs' facts do not establish what the write-up was for.  However, a review of the evidence shows that it was for "failing to intervene when a male patient assaulted another male patient." (Raby Depo. 178.)  Raby testified that, other than the fact that the write-up and reassignment occurred after the interview, there was nothing that leads her to believe that they are related.  (Raby Depo. 193.) Since Raby cannot establish a casual connection between the two events, her retaliation claim must fail.

Count Three

Hostile Work Environment

---

[61]The plaintiffs cite, in the argument portion of their brief, without citation to the record, a number of other incidents of alleged retaliation.  The court considers only those incidents outlined in the "Facts" portion of this opinion, which have been properly supported by evidence.

[62] The plaintiffs  state, in the argument portion of their brief, without citation to the record, a number of other incidents of alleged retaliation.  The court considers only those incidents outlined in the "Facts" portion of this opinion, which have been properly supported by evidence.

To establish a hostile environment claim, a plaintiff must establish that:

(1) he belongs to a protected group; (2) he has been subjected to unwelcome harassment; (3) the harassment was based on his protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (5) the employer is responsible for the environment, either directly or vicariously. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir.2002).

*Reeves v. DSI Sec. Services*, 331 Fed.Appx. 659, 662 (11th Cir. 2009).

In this case, the hostile work environment claims are based only on the alleged discriminatory conduct outlined above. The plaintiffs contend:

Defendants' ratification of discrimination and retaliation adversely interfered with the Plaintiffs' employment to such an extent that it made it more difficult for Plaintiffs to perform their jobs Plaintiffs testified that they were required to work with clients who had a propensity for violence. Whereas, similarly situated whites, Jeremy Blackwood, Carmen Wright, Elizabeth (LNU) and Debbie Hubbard, were not required to work with clients who had were known to be violent or prejudice. Upper management had knowledge of the clients who were violent and took no action to remove Plaintiffs who had been previously attacked by them. Additionally, upper management knew that certain clients were prejudice and took no action to remove Plaintiffs from them even though there imminent threats of attacks.

(Doc. 35, pp. 35-36.)

The plaintiffs make no attempt to make out a prima facie case for a hostile work environment claim. The plaintiffs merely restate their discrimination argument, which the court has already found to be without merit. Further, "hiring decisions, work assignments, and alleged retaliation claims constitute discrete acts and not acts that are considered part of a hostile work environment." *Freeman v. City Of Riverdale*, 330 Fed.Appx. 863, 866 (11th Cir. 2009) (citing *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 970 (11th Cir.2008)).

Summary judgment is due to be granted on the plaintiffs' hostile work environment

claims.

RECOMMENDATION

For the foregoing reasons, it is RECOMMENDED that the motion for summary judgment be GRANTED, and this case DISMISSED. Any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed in the office of the Clerk. Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal. <u>Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.</u> A copy of the objections must be served upon all other parties to the action.

DONE this 26th day of January, 2010.

_____
Robert R. Armstrong, Jr.
United States Magistrate Judge